**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

CHARLES MACK,

                                    Plaintiff,

                    v.                                              No. 9:18-CV-0875
                                                                    (GLS/CFH)
BARRY HALL, et. al.,

                                    Defendants.

_____

**APPEARANCES:**                              **OF COUNSEL:**

CHARLES MACK
50-45 Newtown Road
Apt. 1A
Woodside, New York 11377
Plaintiff pro se

STEINBERG, SYMER & PLATT, LLP          JONATHAN E. SYMER, ESQ.
27 Garden Street
Poughkeepsie, New York 12601
Attorney for defendants
Hall and Jayasena

BROOME COUNTY ATTORNEY'S OFFICE        JENNIFER L. SUWAK, ESQ.
Broome County Office Building
60 Hawley Street
P.O. Box 1766
Binghamton, New York 13902-1766
Attorney for defendant Dewing

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff pro se Charles Mack ("Mack" or "Plaintiff"), who was, at all relevant times, in

_____

    [1]    This matter was referred to the undersigned for report and recommendation pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

the custody of Broome County Correctional Facility ("Broome C.F."), brings this action

pursuant to 42 U.S.C. § 1983 against Defendants Nurse Barry Hall ("Hall"), Nurse Jessica

Jayasena ("Jayasena"), and Correction Officer Sarah Dewing ("Dewing") for violations of

his constitutional rights.  See Dkt. No. 10 ("Am. Compl.").  Presently before the Court are

Defendants' motions for summary judgment.  See Dkt. Nos. 34 and 35.  Mack opposed the

motions and Defendants replied.  See Dkt. Nos. 38, 39, and 40.  For the following reasons,

it is recommended that Defendants' motions for summary judgment be granted.


# I.  BACKGROUND

## A.  Facts[2]

At the relevant time, Mack was incarcerated at Broome C.F. from January 12, 2018,

through April 9, 2018.  See Dkt. No. 34-7 at 65.[3]  Upon arrival at Broome C.F., Mack

reported a history of Type II Diabetes Mellitus and denied any history of heart disease.

See Dkt. No. 34-7 at 76; Dkt. No. 35-6 at 6.  Mack told the intake nurse that he was not

treating his diabetes, "only checked [his] blood sugar when [he was] not feeling well," and

managed his diabetes with his diet.  Dkt. No. 34-7 at 76.  Mack was placed in general

---

[2]  The parties provided exhibits with their submissions, without objection or challenges to the authenticity of any documents.  Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits/documents in the context of the within motion.  See Daniel v. Unum Provident Corp., 261 Fed. App'x 316, 319 (2d Cir. 2008) (summary order) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party" (citation omitted)).  In light of the procedural posture of the case, the following recitation of the facts is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the non-moving party.  See Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).

[3]  Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

population in the E-Pod.  See id. at 79.

On March 12, 2018, at 3:00 p.m., Mack told an officer that he was experiencing "heart problems and pain."  Dkt. No. 34-7 at 83.  The parties offer conflicting accounts of what transpired next.  Mack claims that defendant Jayasena arrived at his cell shortly thereafter.  See id. at 84.  Mack alleges that he had a conversation with Jayasena and told her that he was "having complications with my diabetes because [he was] urinating all day[.]"  Id. at 85.  Mack also claims that he told Jayasena that he felt like he was having a heart attack and that his vision was blurry.  See id.  Mack asserts that, in response to his complaints, Jayasena told him to submit a sick call slip.  See Dkt. No. 34-7 at 85-86.  Conversely, Jayasena claims that she did not have any conversation with Mack on March 12, 2018.  See Dkt. No. 35-10 at ¶ 4.  At 4:00 p.m., Mack submitted a sick call slip and stated, "peed 15 time to[]day and getting littie [sic] pain I [sic] my heart."  Dkt. No. 35-6 at 32; see Dkt. No. 34-7 at 92-93, 95-97.  Jayasena picked up Mack's sick call slip from the dropbox at 4:00 p.m., delivered it to the triage nurse, and claims that was the extent of her involvement with Mack that day.  See Dkt. No. 35-10 at ¶ 4.  At 4:30 p.m., Mack declined sick call.  See Dkt. No. 34-7 at 99; Dkt. No. 35-6 at 71.

On March 13, 2018, Mack received a letter from "medical" stating, "[w]e cannot understand what you are requesting - what is your symptom?"  Dkt. No. 35-6 at 33; see Dkt. No. 34-7 at 97-98.  On March 14, 2018, Mack submitted a sick call slip and stated, "my suger [sic] is hi [sic]."  Dkt. No. 35-6 at 31; Dkt. No. 34-7 at 98.  On March 16, 2018, Mack

3

was evaluated by a nurse. <u>See</u> Dkt. No. 34-7 at 103; Dkt. No. 35-6 at 18-22.[4]  Mack's blood

sugar was elevated to 400 and, as a result, he was placed in a medical cell so that his

blood sugar could be monitored, and a course of insulin was administered. <u>See id.</u> at 103,

106-07; Dkt. No. 35-8 at ¶ 15.  On March 17, 2018, Mack was evaluated by Dr. Butt, a

physician and the Medical Director at Broome C.F.[5]  <u>See</u> Dkt. No. 34-7 at 106.  Because

Mack's blood sugar normalized, he returned to E-Pod.  <u>See id.</u> at 106-07.

On March 23, 2018, Mack went to medical for a routine blood sugar test and was told

by a nurse that his blood sugar level was elevated.  <u>See</u> Dkt. No. 34-7 at 23-26.  Mack

returned to E-Pod, where he walked around, exercised, and tried to bring his sugar level

down.  <u>See id.</u>  Mack testified that, after he returned from medical, he encountered  Hall,

who told plaintiff to "wait for the doctor" in "medical segregation" and, using expletives,

stated "I don't care if you put in grievances against me."[6]  Dkt. No. 34-7 at 27, 108.  Hall

tested Mack's blood sugar level and placed Mack in Administrative Segregation, for two

days.  <u>See</u> Amen. Compl. at 7; Dkt. No. 34-7 at 20, 27-28, 110; Dkt. No. 35-9 at ¶ 3.  From

March 23, 2018, through March 25, 2018, Mack's blood sugar level was monitored.  <u>See</u>

Dkt. No. 34-7 at  at 109-110.  On March 25, 2018, Mack was cleared to return to the E-Pod.

<u>See id.</u> at 111.

On March 27, 2018, Mack filed a grievance (2018-03-006) related to his medical

---

[4]  Although Mack testified at deposition that a nurse evaluated him on March 15, 2018, the medical records indicate that this evaluation was performed on March 16, 2018.  <u>See</u> Dkt. No. 35-6 at 18-22.

[5]  Dr. Butt is not a defendant in this action.

[6]  Hall provided an Affidavit in support of the motion for summary judgment and confirms that he interacted with Mack on March 23, 2018.  Hall did not specifically confirm or deny Mack's account of their verbal exchange.  <u>See generally</u> Dkt. No. 35-9.

4

treatment.  <u>See</u> Dkt. No. 34-7 at 30, 108.  In the grievance, Mack described the incidents that occurred on March 12, 2018, and March 23, 2018, involving Jayasena and Hall.  <u>See</u> Dkt. No. 1 at 8-10.  On March 29, 2018, Mack went to medical for blood testing and to receive insulin.  <u>See</u> Dkt. No. 34-7 at 32-33.  Jayasena administered the insulin in the medical waiting room while defendant Dewing was present.[7]  <u>See id.</u>  Mack refused to accept six units of insulin, as prescribed by Dr. Butt, and said that he would "take" two units.  <u>Id.</u> at 35.  Jayasena refused Mack's request and advised that Mack was required to take six units of insulin pursuant to Dr. Butt's orders.  <u>See id.</u>; Dkt. No. 35-10 at ¶¶ 6, 7.  Mack was told to remain in the waiting room while Jayasena contacted Dr. Butt.  <u>See</u> Dkt. No. 34-7 at 112-113.  While he waited in medical, Mack witnessed Dewing and Jayasena conversing inside an office, but he could not hear their discussion.  <u>See id.</u> at 35-36.  Jayasena claims that she contacted Dr. Butt to inform him that Mack refused to take his prescribed medication.  <u>See</u> Dkt. No. 35-10 at ¶ 7.  Dr. Butt avers that he directed Jayasena to confine Mack to the medical department.  <u>See</u> Dkt. No. 35-8 at ¶ 21.  Jayasena claims that she relayed Dr. Butt's instructions to Dewing.  <u>See</u> Dkt. No. 34-2 at ¶ 3; Dkt. No. 35-10 at ¶ 7.  While the parties dispute the facts surrounding Mack's transfer to the medical cell, the record indicates that, at 11:30 a.m., Dewing completed an Administrative Segregation Order and called "rovers" to escort Mack to Administrative Segregation in the medical unit.[8]  Dkt. No. 34-2 at ¶ 4; Dkt. No. 34-6 at 3; Dkt. No. 34-7 at 37.

---

[7]  Mack had no contact with Dewing prior to March 29, 2018.  <u>See</u> Dkt. No. 34-7 at 43.

[8]  Dewing claims that Mack was irate and yelled when she ask him to move to the medical cell.  <u>See</u> Dkt. No. 34-2 at ¶ 4.  Mack claims that he was not argumentative.  <u>See</u> Dkt. No. 34-7 at 37.

An Incident Report was prepared and included the following narrative:

> On 3/29/2018 at approximately 1130 hours, Nurse Jessica Jayasena informed me that per Dr. Butt[,] Inmate Charles Mack is to live in Medical 2 to be evaluated. During the 1100 hours chemstrips, Inmate Mack refused to take his 6 units of insulin and would only accept 2 units. Inmate Mach [sic] refused to live in Medical 2. I then called for a couple of rovers to respond to Medical 2 to assist me with the situation. Officer Johnson and Officer Tyner responded and escorted Inmate Mack into Medical 2 cell #11. No further incident.

Dkt. No. 38 at 4.

On March 29, 2018, Dewing issued a Notice of Infraction charging Mack with refusing an order, conduct that disrupts the safety of the facility, and planning to commit a violation. See Dkt. No. 38 at 5. Dewing also completed a second Administrative Segregation Order that stated, [t]his inmate must be placed in Administrative Segregation in SHU [. . .] because: [t]he inmate is awaiting a hearing for violation of facility rules and is a danger to the safety and welfare of other persons in the facility, or to its orderly or secure operation." Dkt. No. 34-6 at 4.

On March 31, 2018, Dr. Butt examined Mack and released him from medical segregation. See Dkt. No. 35-8 at ¶ 23; Dkt. No. 34-7 at 91, 113-115. On March 31, 2018, Mack was transferred to the E-Pod in the Special Housing Unit ("SHU"), where he remained until April 6, 2018.[9] See Dkt. No. 34-2 at ¶ 5; Dkt. No. 34-7 at 37, 92, 118. On April 6, 2018, Mack was transferred to state prison and thus, the disciplinary hearing related to the March 29, 2018 incident, which was scheduled for April 19, 2018, was waived. See Dkt. No. 34-7 at 30-31; Dkt. No. 38 at 5. Mack did not file a grievance

---

[9] Mack had no contact with Dewing after March 29, 2018. Dkt. No. 34-7 at 116.

related to the March 29, 2018 incident.  See Dkt. No. 34-7 at 44.

## B.  Procedural History

In June 2018, Mack commenced this action.  See Dkt. No. 1.  In September 2018, Mack filed an Amended Complaint with a supplement.  See Dkt. Nos. 10 and 11.  Upon review of the Amended Complaint, the Court directed Hall, Jayasena, and Dewing to respond to retaliation claims and Jayasena to respond to medical indifference claims.  See Dkt. No. 12.  Defendants filed Answers to the Amended Complaint, Dkt. Nos. 22, 23, 30, and on April 10, 2019, Mack appeared at a deposition.  See Dkt. No. 34-7.

On September 13, 2019, Dewing filed the within motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to Mack's claims.  See Dkt. Nos. 34, 39 (reply in support).  On September 14, 2019, Hall and Jayasena filed a motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to Mack's claims.  See Dkt. Nos. 35, 40 (reply in support).  Mack opposed the motions.  See Dkt. No. 39.

## II.  DISCUSSION

Mack contends that Defendants retaliated against him in violation of his First Amendment rights and that Jayasena was deliberately indifferent to his medical needs in violation of his constitutional rights.  See generally Am. Compl.  Dewing contends that Mack failed to exhaust his administrative remedies and further, that the First Amendment

retaliation claim lacks merit.[10]  See generally Dkt. No. 34-9.  Alternatively, Dewing argues

that she is entitled to qualified immunity.[11]  See id.  Hall and Jayasena also argue that they

are entitled to judgment as a matter of law on the retaliation claims and further contend

that Mack cannot establish a deliberate indifference claim related to his medical treatment.

 See generally Dkt. No. 35-12.

## A.  Legal Standards

### 1.  Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment may be

granted only if all the submissions taken together "show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The moving party has

the burden of showing the absence of a genuine dispute of material fact by providing

the Court with portions of "pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any," which support the motion.

Celotex, 477 U.S. at 322; see FED. R. CIV. P. 56(c).  A fact is material if it "might

---

[10]  In the Answer, Dewing pleaded, among other things, the affirmative defense that Mack failed to exhaust his administrative remedies.  See Dkt. No. 30 at ¶ 20.

[11]    The Court did not construe the Amended Complaint as asserting a cognizable Fourteenth Amendment due process claim or a claim against Defendants, in their official capacities.  See generally, Dkt. No. 12.  While Dewing sets forth arguments in her motion related to these issues, see Dkt. No. 34-9 at 5-7, 14-15, the Court will not engage in a discussion or analysis of claims that did not survive the Court's sua sponte initial review.

affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Id. at 248, 250; see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp. (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir. 1985) (per curium)). Furthermore, "mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (brackets omitted) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford

9

the non-movant special solicitude.  See Triestman v. Federal Bureau of Prisons, 470 F.3d

471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to "special solicitude," . . . that a *pro se*
> litigant's submissions must be construed "liberally,". . . and
> that such submissions must be read to raise the strongest
> arguments that they "suggest," . . . .  At the same time, our
> cases have also indicated that we cannot read into *pro se*
> submissions claims that are not "consistent" with the *pro se*
> litigant's allegations, . . . or arguments that the submissions
> themselves do not "suggest," . . . that we should not "excuse
> frivolous or vexatious filings by *pro se* litigants," . . . and that
> *pro se* status "does not exempt a party from compliance with
> relevant rules of procedural and substantive law.

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v.

Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## 2.  N.D.N.Y. Local Rule 7.1(a)(3)

In support of the motions, Defendants filed Statements of Material Facts.  See Dkt.

Nos. 34-8, 35-11.  Local Rule 7.1(a)(3) requires a party moving for summary judgment to

file and serve a Statement of Material Facts.  See N.D.N.Y. L.R. 7.1(a)(3).  "The Statement

of Material Facts shall set forth, in numbered paragraphs, each material fact about which

the moving party contends there exists no genuine issue."  Id.  The opposing party is

required to file a response to the Statement of Material facts "admitting and/or denying

each of the movant's assertions in matching numbered paragraphs."  Id.  "The Court shall

deem admitted any properly supported facts set forth in the Statement of Material Facts

that the opposing party does not specifically controvert."  Id. (emphasis omitted).

Defendants argue that because Mack failed to submit any response to their Statements of Material Facts, the facts set forth in the Statements of Material Facts must be deemed admitted.  See Dkt. Nos. 39-2 at 4-9 and 40-1 at 5-6.  The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute." Prestopnik v. Whelan, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (internal quotation marks and citation omitted).  Although Defendants argue, and the Local Rules provide, that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert," pro se plaintiffs are afforded special solicitude in this District and within the Second Circuit.  N.D.N.Y. L.R. 7.1(a)(3); see subsection II.A.1, supra.  Accordingly, in deference to Mack's pro se status, the Court will independently review the record when evaluating Defendants' motions for summary judgment, and "treat [plaintiff's] opposition as a response to" Defendants' Statement of Material Facts.  Johnson v. Lew, No. 1:13-CV-1072 (GTS/CFH), 2017 WL 3822047, at *2 (N.D.N.Y. Aug. 30, 2017) ("Out of special solicitude to [the p]laintiff as a pro se civil rights litigant, however, the Court will treat his opposition as a response to [the d]efendant's Rule 7.1 Statement, carefully reviewing it for any record-supported disputation of [the d]efendant's Rule 7.1 Statement." (footnote omitted)); see Perry v. Ogdensburg Corr. Facility, No. 9:10-CV-1033 (LEK/TWD), 2016 WL 3004658, at *1 (N.D.N.Y. May 24, 2016) (determining that "although [the p]laintiff failed to respond to the statement of material facts filed by [the d]efendants as required under Local Rule 7.1(a)(3), the Court would invoke its discretion to review the entire record when evaluating the parties' respective [m]otions for summary judgment.").

11

## B. Exhaustion

Dewing argues that Mack's retaliation claims against her must be dismissed because Mack failed to exhaust his administrative remedies through available grievance procedures.  See Dkt. No. 34-9 at 10-11.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration.  See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  The exhaustion requirement applies "'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'"  Cucchiara v. Dumont, No. 9:18-CV-0182 (GLS/CFH), 2019 WL 2516605, at *4 (N.D.N.Y. Apr. 26, 2019) (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)); see also Baez v. Parks, No. 02-CV-5821 (PKC/DF), 2004 WL 1052779, at *5 (S.D.N.Y. May 11, 2004) ("[T]he PLRA's strict exhaustion requirement does indeed apply in actions brought by pretrial detainees.").  Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages.  See Porter, 534 U.S. at 524.  "To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated."

Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *3

(N.D.N.Y. Apr. 8, 2015); see Jones v. Bock, 549 U.S. 199, 218 (2007).

While the Supreme Court has deemed exhaustion mandatory, the Second

Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange,

467 F.3d 170, 175 (2d Cir. 2006) (internal quotation marks and citation omitted).

Previously, courts in this District followed a three-part test established by the Second

Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test

established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff

established that his or her failure to exhaust was justified by "special circumstances."

Id. However, in Ross v. Blake, the Supreme Court held that "[c]ourts may not

engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion

requirement." Ross v. Blake, ____ U.S. ____, 136 S. Ct. 1850, 1862 (2016). Thus,

the special circumstances exception previously promulgated by the Second Circuit in

Hemphill is no longer consistent with the statutory requirements of the PLRA. See

Williams v. Correction Officer Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

However, courts must still consider the PLRA's "textual exception to

mandatory exhaustion." Ross, ____ U.S. ____, 136 S. Ct. at 1858. Under this

exception, courts must determine whether administrative remedies were "available"

to a prisoner. Id. The Supreme Court identified three circumstances where

administrative remedies may be unavailable to a prisoner. First, "an administrative

procedure is unavailable when (despite what regulations or guidance materials may

promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)).  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  Id.  Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  Id. at 1860.  "The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action."  McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017) (citation omitted).


### 1.  Did Plaintiff Exhaust his Administrative Remedies

In support of the motion for summary judgment, Defendants provided an Affidavit from James R. Borchardt ("Borchardt"), the Inmate Grievance Officer for Broome C.F.  See Dkt. No. 34-4.  Borchardt avers that an inmate would initiate the grievance process at Broome C.F. by requesting a grievance from the Inmate Grievance Officer.  See id. 34-4 at ¶ 4. The Inmate Grievance Officer conducted daily tours to take grievances from inmates.  See id.  Borchardt reviewed the inmate grievance records and found "no record of a grievance by Plaintiff, Charles Mack, regarding the incident on March 29, 2018[.]"  Id. at ¶ 6.  With her Memorandum of Law in Reply, Dewing submitted an Affidavit from Paul Carlson, the Captain for Broome C.F., attesting to facts related to Mack's knowledge of the grievance

14

process at Broome C.F.  See Dkt. No. 39.  Because the affidavit is new evidence, and

Mack was not provided with an opportunity to respond to the evidence in a sur-reply, the

Court will not consider the affidavit.  See Connecticut Indem. Co. v. QBC Trucking, Inc.,

No. 03 CIV. 4257, 2005 WL 1427424, at *2 (S.D.N.Y. June 20, 2005) (citation omitted).

Mack however, does not dispute the fact that a grievance process existed at Broome C.F.

Moreover, his actions demonstrate that he was aware of the process.  During the

deposition, Mack testified that he spoke with a grievance officer on March 12, 2018, and

that he filed a grievance on March 27, 2018.  See Dkt. No. 34-7 at 44-45.  Additionally, in

March 2018, Mack submitted three forms entitled "Request For Inmate/Supervisor

Consultation" asking to see the grievance officer and for a "grievance sheet for medical."

Dkt. No. 11 at 4.  Mack also admits that he did not file a grievance against Dewing.  See

Dkt. No. 34-7 at 43-44.

Mack does not dispute that he failed to exhaust his administrative remedies related to

any claims arising from the March 29, 2018 incident with Dewing and failed to respond to

Defendant's motion related to his failure to exhaust retaliation claims against her.

Therefore, Defendant has met her burden of showing that Mack failed to exhaust his

administrative remedies with respect to the retaliation claims asserted against Dewing.  As

a result, the Court must assess whether administrative remedies were available to Mack.

### 2. Availability of Administrative Remedies

Administrative remedies may be unavailable where "prison administrators thwart

inmates from taking advantage of a grievance process through machination,

misrepresentation, or intimidation."  Ross, _____ U.S. _____, 136 S. Ct. at 1860.

Mack alleges that the grievance procedure was not available to him because "[t]he Grievance Officer at the time in March[,] [t]old me it[']s the same incident and he told me he [was] not going to give me a new grievance sheet."  Dkt. No. 38 at 2.  Mack did not provide a physical description or the name of the grievance officer.  See Dkt. No. 34-7 at 45.  Even assuming that a grievance officer denied Mack's request for a grievance form, the lack of access to a grievance form does not render the grievance process unavailable. See Ceparano v. Cty. of Suffolk, No. 10-CV-2030 (SJF/AKT), 2013 WL 6576817, at *5 (E.D.N.Y. Dec. 13, 2013) ("[E]ven if [the] plaintiff was unable to obtain official grievance forms, New York law permits the filing of grievances on any plain piece of paper."); see also 7 N.Y.C.R.R. § 701.5(a)(1) ("If this [grievance] form is not readily available, a complaint may be submitted on plain paper.").  In fact, the evidence establishes that Mack had the opportunity to file a grievance on a plain piece of paper and clearly understood that the option was available.  In support of his claim, Mack provided copies of three slips entitled "Requests for Inmate/Supervisor Consultation," which he claims to have submitted in March 2018.  Dkt. No. 11 at 4.  In Mack's March 25, 2018 request, Mack asked, "[t]he grievance officer to send me a grievance sheet or I'm going to make one[.]"  Id.

Thus, the Court finds that there is no genuine dispute of fact that administrative remedies were available.  Accordingly, as exhaustion is a prerequisite to filing an action in federal court, it is recommended that Dewing's motion for summary judgment, on this ground, be granted.

16

## C. Retaliation Claims

In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: that "(1) . . . the speech or conduct at issue was protected, (2) . . . the defendant took adverse action against the plaintiff, and (3) . . . there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context . . . adverse action" is "defined . . . objectively[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Id. With respect to the third element of the test, although "'[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, . . . without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (quoting Espinal, 558 F.3d at 129).

"Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *18 (N.D.N.Y. March 28, 2014) (citation omitted); see Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show dual motivation, i.e.,

that even without the improper motivation the alleged retaliatory action would have occurred." (italics omitted)).

"[P]risoner retaliation claims are easily fabricated, and . . . pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." Green v. Phillips, No. 04-CV-10202 (TPG), 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing Brown v. Middaugh, 41 F. Supp. 2d 172, 191 (N.D.N.Y. 1999) (additional citation omitted)). Consequently, a plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. See id.; see also Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial.") (internal quotation marks and citation omitted)). Allegations, although specific, "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Smith v. Woods, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006) (internal quotation marks, citations, and footnote omitted).

18

### 1. Claim Against Hall

Mack alleges that Hall placed him in Administrative Segregation on March 23, 2018 in retaliation for grievances.  See Am. Compl. at 5.

### a. Protected Conduct

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity.  See Espinal, 558 F.3d at 128.  The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity.  See Gill, 389 F.3d at 384.  Hall does not dispute that Mack engaged in protected conduct when he filed Grievance No. 2018-03-006.  However, Hall argues that the grievance was filed after the March 23, 2018 incident and thus, does not support a retaliation claim against Hall.  See Dkt. No. 40-1 at 8.  While the record supports that conclusion, Hall did not address Mack's claim that he also engaged in protected conduct prior to the alleged adverse action.   As noted supra, from March 23, 2018, until March 25, 2018, Mack filed three Requests for Inmate/Supervisor Consultations in an attempt to "put[] in a [g]rievance" about the medical staff.  Am. Compl. at 5; see Dkt. No. 11 at 4.  In each request, dated March 22, 2018, March 23, 2018, and March 25, 2018, Mack asked to see the Grievance Officer to obtain a "grievance sheet for medical."  Dkt. No. 11 at 4.

Because requesting a grievance constitutes protected activity, see Gill, 389 F.3d at 384, the Court is unable to conclude, as a matter of law, that Mack did not engage in protected conduct prior to March 27, 2018.

### b. Adverse Action

19

With respect to the second prong of the retaliation analysis, Hall argues that Mack's two-day confinement in a medical cell did not constitute an "adverse action." Dkt. No. 35-12 at 10-11; Dkt. No. 40 at 7-8. Hall does not cite to any supporting caselaw and, based upon the record, the Court disagrees. The Second Circuit has held that being placed in keeplock or otherwise confined is an adverse action. See Gill, 389 F.3d at 384; see also Marshall v. Griffin, No. 18-CV-6673 (KMK), 2020 WL 1244367, at *6 (S.D.N.Y. Mar. 16, 2020) (declining to conclude, as a matter of law, that the plaintiff's allegation that he was placed in confinement for six days in retaliation for filing a grievance was a *de minimis* act that did not constitute an adverse action).

While Hall avers that he did not have the authority to confine Mack for disciplinary reasons and describes Mack's confinement as being "placed in the Medical Unit at BCCF," see Dkt. No. 35-9 at ¶ 3, the record includes an "Administrative Segregation Order," signed by Hall, with the notation "MED". Amen. Compl. at 7. Setting aside the semantics and differing definitions of the confinement, the evidence establishes that, while Mack was confined from March 23, 2018, until March 25, 2018, he did not have access to a telephone, television, he could not interact with other inmates, and he had to "stay in one place." Dkt. No. 34-7 at 28, 91.

As Hall has moved for summary judgment and thus, bears the burden of establishing that no issue of fact exists as to whether Mack's confinement was an adverse action, the undersigned concludes that Defendant has not met that burden. See Celotex, 447 U.S. at 322. Mack testified that he when encountered Hall in the medical unit on March 23, 2018, for a re-check of his blood sugar, Hall told him, with expletives, "I don't care if you put in

grievances against me.  We don't care."  Dkt. No. 34-7 at 27, 108.  Given the statements

that Mack attributes to Hall, arguably there is a genuine issue of fact with respect to

whether Mack's confinement was an adverse action.  See Gill, 389 F.3d at 384; Marshall,

2020 WL 1244367, at *6.

### c.  Causal Connection

The plaintiff bears the burden of establishing that "the protected conduct was a

substantial or motivating factor in the prison officials' decision to discipline the plaintiff."

Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (internal quotation marks and citation

omitted).  A plaintiff "may do so with circumstantial evidence if it is 'sufficiently

compelling[.]'"  Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order)

(quoting Bennett v. Goord, 343 F.3d 133, 139 (2d Cir. 2003)).

> In determining whether a causal connection exists between the
> plaintiff's protected activity and a prison official's actions, a
> number of factors may be considered, including: (i) the
> temporal proximity between the protected activity and the
> alleged retaliatory act; (ii) the inmate's prior good disciplinary
> record; (iii) vindication at a hearing on the matter; and (iv)
> statements by the defendant concerning his motivation.

Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citation omitted).

As discussed supra, Mack testified that Hall referred to Mack's attempts to file

grievances before Mack was ordered into Administrative Segregation.  See Dkt. No. 34-7

at 27, 108.  Hall provided an Affidavit in support of the motion and does not describe his

interaction with Mack in the same manner.  See Dkt. No. 35-9.

A determination of whether Hall was aware that Mack attempted to file grievances or

complained about the medical staff prior to his decision to place Mack in Administrative

Segregation, involves an issue of credibility that is inappropriate to be decided for

purposes of this motion.  See Yoselovsky v. Assoc. Press, 917 F. Supp. 2d 262, 272

(S.D.N.Y. 2013) (holding that "[a]ssessments of credibility, choosing between conflicting

versions of events, and the weighing of evidence are matters for the jury, not for the

[c]ourt," to decide on a motion for summary judgment.).  The statements attributed to Hall,

if true, strongly suggest that he was motivated by retaliatory intent and, thus present

genuine issues of material fact concerning the nexus element of the retaliation test, which

preclude the entry of summary judgment in connection with the retaliation claim.  See

Roland v. McMonagle, No. 12-CV-6331 (JPO), 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9,

2015) (finding an issue of fact as to retaliation where the plaintiff presented evidence that

the defendants were aware of the complaints and mocked him for filing grievances during

the attack).

### d.  Confinement Absent Protected Conduct

Hall argues that, even assuming the evidence creates a material question of fact as to

whether he had retaliatory intent, he would have made the same decision to place Mack in

the Administrative Segregation even in the absence of the protected conduct, as Mack's

"placement and maintenance in the medical unit was medically warranted and appropriate"

Dkt. No. 35-12 at 11.

"The plaintiff bears the burden of showing that the conduct at issue was

constitutionally protected and that the protected conduct was a substantial or motivating

factor in the prison officials' decision to discipline the plaintiff." Graham v. Henderson, 89

F.3d 75, 79 (2d Cir. 1996) (citation omitted). "[T]he defendant[] must show by a

preponderance of the evidence that they would have disciplined the plaintiff even in the

absence of the protected conduct. Id. (internal quotation marks and citation omitted).

"If the defendant does so, then the burden shifts back to the plaintiff to demonstrate by

competent evidence that 'the legitimate reasons offered by the defendant were not its true

reasons, but were a pretext for [retaliation].'" Dillion v. Suffolk County Dept. of Health

Servs., 917 F. Supp. 2d 196, 204 (E.D.N.Y. 2013) (quoting Patterson v. Cnty. of Oneida,

N.Y., 375 F.3d 206, 221 (2d Cir. 2004)). "[T]he conclusion that the state action would

have been taken in the absence of improper motives is readily drawn in the context of

prison administration where [courts] have been cautioned to recognize that prison officials

have broad administrative and discretionary authority over the institutions they manage."

Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (quoting Lowrance v. Achtyl, 20 F.3d

529, 535 (2d Cir. 1994)).

Hall maintains that Mack was placed in "medically appropriate" confinement because

his blood sugar levels fluctuated throughout the day between 303 and 109. Dkt. No. 35-9

at ¶ 3; Dkt. No. 35-12 at 11. Hall avers that while Mack was confined, his blood glucose

levels and food intake were monitored, insulin was administered, and medication was

added to his regimen. See Dkt. No. 35-9 at ¶¶ 3-4. Mack was released after two days of

confinement because his diabetes was under "good control" and he agreed to comply with

medications and blood glucose evaluations. Id. at ¶ 5.

Because Hall proffered a legitimate, non-retaliatory reason for placing Mack in

23

Administrative Segregation, to avoid summary judgment, Mack must bring forward some evidence of pretext. See Gill v. Calescibetta, No. 9:00-CV-1553 (GTS/DEP), 2009 WL 890661, at *9 (N.D.N.Y. Mar. 31, 2009) ("Once [a legitimate non-discriminatory] reason [for taking adverse action] has been cited [by the defendant], the burden of production reverts to the plaintiff, who retains the ultimate burden of establishing both pretext and that retaliation was a motivating factor in the determination, by a preponderance of evidence.").

In this regard, Mack testified that his blood sugar level was significantly higher earlier in the day, when the medical staff sent him back to E-Pod. See Dkt. No. 34-7 at 27. Thus, Mack argues that Hall's actions were retaliatory because Mack's low blood sugar level did not warrant segregation. See Amen. Compl. at 1, 5.

First, the court notes that the record before the Court does not support Mack's conclusions related to his blood sugar levels. See Dkt. No. 35-9 at ¶ 3 (Hall avers that Mack's blood glucose level was 303 when he was placed in the Medical Unit, having been 109 on earlier testing that day). Second, even assuming the truth of Mack's statements related to his blood sugar level, without more this fact does not create an issue of fact related to pretext. Mack admits that the notation "MED" on the Administrative Segregation Order indicates that he was placed in segregation for medical purposes. Amen. Compl. at 7; Dkt. No. 34-7 at 20. Finally, Mack does not deny that his blood sugar levels were unstable and uncontrolled and, in fact, concedes that he was concerned. Significantly, Mack testified that he reported to the medical staff at 12:35 p.m. on March 23, 2018, that he didn't feel well due to high blood sugar and asked the medical staff for "an IV." Dkt. No. 34-7 at 109; see Dkt. No. 35-6 at 54-55. Mack testified that when his blood sugar was

initially checked on March 23, 2018, it was between 350 and 375.  Dkt. No. 34-7 at 27-28, 110.  Mack claims that returned to E-Pod and tried to "bring down [his] sugar," and when Hall retested Mack's blood sugar level, it was between 130 or 140.  Id.

Mack's conclusory assertion that Hall acted with retaliatory intent is further undermined by the fact that Mack's confinement was brief and that he was discharged after two days when testing revealed that his diabetes was controlled and Mack consented to comply with medications and continued testing.  See Dkt. No. 35-9 at ¶ 5; see Hughes v. Butt, No. 9:17-CV-1151 (DNH/ML), 2019 WL 6970794, at *18 (N.D.N.Y. Sept. 17, 2019) (reasoning that the plaintiff's admission that his blood sugar was unstable and unmanaged supported the defendant's legitimate, non-retaliatory reason for transferring the plaintiff to the medical unit); see also Ramsey v. Squires, 879 F. Supp. 270, 279 (W.D.N.Y.) (finding the plaintiff's pretext argument related to his segregation conclusory, "particularly in view of the clear evidence that [the] plaintiff's privileges were gradually restored" after evaluations), aff'd, 71 F.3d 405 (2d Cir. 1995).

The Court also notes that, in opposition to the motion for summary judgment, Mack presented arguments pertaining only to Jayasena and Dewing.  See generally Dkt. No. 38. In light of Mack's failure to present any argument in opposition to Hall's motion, and because Mack has failed to present competent, admissible evidence which would allow a juror to conclude that Hall's reasons were pretextual, the Court recommends granting Hall's motion for summary judgment and dismissal of the retaliation claims.  See Feacher v. Intercontinental Hotels Grp., 563 F. Supp. 2d 389, 399 (N.D.N.Y. 2008) ("The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the

25

claim, and, in the Northern District of New York, is deemed consent to granting that portion

of the motion.") (internal citation omitted) (citing N.D.N.Y. L.R. 7.1(b)(3) ('Where a properly

filed motion is unopposed and the Court determines that the moving party has met its

burden to demonstrate entitlement to the relief requested therein, the non-moving party's

failure to file or serve any papers as this Rule requires shall be deemed as consent to the

granting or denial of the motion, as the case may be, unless good cause is shown.")).


### 2.  Claims Against Jayasena and Dewing[12]

Mack claims that Jayasena and Dewing retaliated against him when they placed him in

Administrative Segregation on March 29, 2018.  See Am. Compl. at 1.  Mack also

contends that Dewing retaliated against him when she issued an Incident Report resulting

in his confinement in E-Pod.  See Dkt. No. 34-7 at 118.


### a.  Protected Conduct

As discussed supra, Mack engaged in protected conduct with the filing of a grievance

on March 27, 2018.  While Jayasena argues that Grievance No. 2018-03-006, "was not

submitted at the time of the March 29, 2018 occurrence[,]" Dkt. No. 40-1 at 9, the record

evidence does not support that conclusion.  Mack filed the grievance on March 27, 2018,

two days before the subject incident, complaining about medical treatment involving

Jayasena.  Thus, Mack has satisfied the first prong of the First Amendment retaliation

---

[12]    For the sake of completeness, the Court will address the merits of the retaliation claim
against Dewing.

26

analysis.

### b. Adverse Action

Defendants argue, as Hall did, that Mack's two-day confinement in a medical cell can not be construed as an adverse action.  See Dkt. No. 35-12 at 14.  For the reasons set forth in subsection II(C)(1)(b), supra, the Court finds no merit in that argument.

To the extent that Jayasena argues that she was not personally involved in the decision to place Mack in Administrative Segregation because she was simply following Dr. Butt's orders, the Court does not agree.  See Dkt. No. 35-12 at 13.  Jayasena concedes that she provided medical treatment to Mack and that she engaged in a verbal dispute with Mack regarding his prescribed treatment.  See Dkt. No. 35-10 at ¶¶ 6-7. Jayasena also claims that she contacted Dr. Butt to discuss Mack's treatment, relayed Dr. Butt's orders to Dewing, and Dewing, acting upon Jayasena's directive, called rovers to escort Mack to Administrative Segregation.  See Dkt. No. 34-2 at ¶¶ 3-4; Dkt. No. 35-10 at ¶ 7.  Based upon the record evidence before the Court, a triable issue of fact exists regarding Jayasena's personal involvement in the decision to transfer Mack to Administrative Segregation.

The Court further notes that Mack's subsequent confinement in the SHU satisfies the second prong of the retaliation analysis, as against Dewing.  Based upon Dewing's incident report, Mack was transferred to the SHU on March 31, 2018 and remained there until April 6, 2018.  See Dkt. No. 34-7 at 91-92, 114-115.  This confinement qualifies as an

adverse action.[13]  See Gill, 389 F.3d at 383 (holding that the imposition of SHU housing would objectively deter a similarly situated individual of ordinary firmness from exercising constitutional rights).

### c.  Causal Connection

With respect to the third prong of the retaliation analysis, Mack claims that Jayasena and Dewing retaliated against him on March 29, 2018 because he filed a grievance against Jayasena on March 27, 2018.  See Dkt. No. 34-7 at 36.  While "temporal proximity, . . . alone, is insufficient to defeat summary judgment," Williams v. King, 763 F. App'x 36, 38-39 (2d Cir. 2019) (summary order), in this instance Jayasena does not dispute Mack's claim that she was aware of that he had filed a grievance related to his medical treatment. See generally Dkt. No. 35-10.  Accordingly, the Court cannot conclude, as a matter of law, that Mack failed to establish a causal connection between his March 27, 2018 grievance and Jayasena's action.

A different conclusion is reached however, with respect to the causal connection between the grievance and Dewing's actions.  Mack draws the conclusion that Dewing was aware of the grievance because he saw Jayasena and Dewing "talking inside the [medical] office" after Mack refused to take six units of insulin.  Dkt. No. 34-7 at 35.  Mack surmises that Jessica was telling Sarah that he put in a grievance against her because he saw the defendants "huddled up" in the office, looking at him.  Id. at 41.  As further support for his

---

[13]  Mack does not suggest, and the record does not support the conclusion that Jayasena was involved in Mack's transfer to the SHU.  See Dkt. No. 34-3; Dkt. No. 35-10 at ¶ 7.

conclusion, he testified that, within "three, four minutes" after the conversation, the rovers arrived to escort him to the medical cell.  Id. at 38.

However, Mack concedes that he was in the lobby while the conversation took place and that he could see Jayasena and Dewing in the office, but did not specifically hear Jayasena tell Dewing about the grievance.  Dkt. No. 34-7 at 42.  Mack testified:

> Q.    Are you maintaining your testimony that you never heard Nurse Jessica tell Sarah Dewing about a grievance.
> A.    No. I want to say that she - - I ain't hear her say it. How she was looking at me, how they were both looking at me.  She was telling them about it.
> Q.    So you never heard her say it - -
> A.    Never.
> Q.    You're just saying because the way they were look at you?
> A.    Yes.  Exactly.

Id.

Dewing avers that she was not aware that Mack had filed a grievance when she called the rovers.  See Dkt. No. 34-2 at ¶ 7.

"As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant."  Burroughs v. Mitchell, 325 F. Supp. 3d 248, 282 (N.D.N.Y. 2018) (internal quotation marks and citation omitted); see Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing a retaliation claim against a correction officer where the only alleged basis for retaliation was a complaint written against another officer).  In this case, the record lacks facts that would allow the Court to draw the "legitimate inference" that Dewing retaliated against Mack based on his grievance filed against Jayasena.  Espinal, 558 F.3d at 130; see Wright, 554 F.3d at 274; Burroughs, 325 F. Supp. 3d at 282.  Mack

29

has offered nothing more than speculation without corroborating evidence from any other witnesses.  Mack did not proffer any evidence to contradict Dewing's sworn statement that she was unaware that Mack filed a grievance when she called the rovers.  Indeed, Mack concedes that he never had any contact, arguments, or misunderstandings with Dewing prior to March 29, 2018.  See Dkt. No. 34-7 at 43-44.  Mack's conclusory assertions are insufficient to create a triable issue of fact as to the third element of a retaliation claim against Dewing.  Accordingly, the retaliation claim cannot survive Dewing's motion for summary judgment.

### d.  Confinement Absent Protected Conduct

### i.  Administrative Segregation

Defendants argue that, even assuming the evidence creates a material question of fact as to whether they had retaliatory intent, they would have made the same decision to place Mack in the medical unit cell even in the absence of the protected conduct.  See Dkt. No. 34-9 at 9; Dkt. No. 39-2 at 6.

Jayasena claims that, at 11:00 a.m. on March 29, 2018, Mack's blood sugar level was 211.  See Dkt. No. 35-6 at 54; Dkt. No. 35-10 at ¶ 6.  Jayasena avers that based upon "Dr. Butt's order for a sliding scale of insulin," Mack required "6 units of insulin" but "only wanted to take 2 units of insulin and adamantly requested that I modify Dr. Butt's order."  Dkt. No. 35-10 at ¶ 6.  Jayasena asked Mack to sit in the waiting room while she telephoned Dr. Butt.  See Dkt. No. 35-6 at 54; Dkt. No. 35-10 at ¶ 7.  Dr. Butt asked Jayasena to retain Mack in the medical unit, and Jayasena asked Dewing "to do so."  Dkt. No. 34-2 at ¶ 3; see

Dkt. No. 35-10 at ¶ 7.  The medical record contains a Progress Note, prepared by Jayasena on March 29, 2018 at 12:14 p.m., that supports Jayasena's version of the events that transpired.  See Dkt. No. 35-6 at 54.

In support of the motion for summary judgment, Defendants also submitted the Affirmation of Dr. Butt.  See Dkt. No. 35-8.  Dr. Butt states that, upon being informed by Jayasena that Mack refused to take the prescribed dose of insulin, he directed Jayasena to maintain Mack in the medical department, "solely so his diabetic regimen could be addressed after a followup examination by me[.]"  Id. at ¶ 21.  Dr. Butt further notes that while Mack was housed in the medical unit, his glucose and dietary intake were monitored. See id. at ¶ 22.  On March 31, 2018, Dr. Butt re-evaluated Mack and found that his glucose levels were improved and ordered him released.  See id. at ¶ 23.

Because Defendants established a legitimate, non-retaliatory reason for placing Mack in Administrative Segregation, Mack must bring forward some evidence of pretext.  While Mack admits that he refused to take the prescribed dosage of insulin, see Dkt. No. 34-7 at 34-37, he attempted to justify his decision and explained that, on March 27, 2018, "[Jayasena] gave me too much insulin.  My blood sugar was so low that when I was inside a cell, that it's like I couldn't - - I couldn't really help myself.  My blood sugar was so low[.]"  Id. at 34-35.  Mack claims that he was "shakin [sic] in my jail cell all nite [sic]."  Dkt. No. 38 at 2.

Mack's conclusory allegations are unsupported by competent evidence.  The medical record lacks any evidence suggesting that Mack reacted negatively to the administration of insulin by Jayasena on March 27, 2018.  Indeed, Mack filed a grievance against Jayasena

on March 27, 2018, and failed to include any complaints related to an adverse reaction to insulin.  See Dkt. No. 1 at 8-10.  The medical record also indicates that Mack was not always compliant with his medical regimen.  Indeed, a notation on March 26, 2018 indicates, "Inmate Refused 4 units Humalog."  Dkt. No. 35-6 at 60.

Thus, Mack has not established that the proffered reasons for placing him in a medical cell were done as pretext for retaliation.  See Smith v. Deckelbaum, No. 97-CV-1265 (JSM), 2000 WL 1855128, at *4 (S.D.N.Y. Dec. 19, 2000) (holding that, "[a]lthough [the plaintiff's evidence] c[ould] lead to an inference of pretext, the Second Circuit Court of Appeals has indicated that a plaintiff must submit more than circumstantial evidence of retaliation in order to survive a motion for summary judgment." (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995))).  Accordingly, the Court recommends that Jayasena and Dewing be granted summary judgment on the retaliation claims related to Mack's confinement in Administrative Segregation.

### ii.  SHU Confinement

Dewing presents the same argument and claims that she would have issued the Incident Report absent Mack's protected conduct.  See Dkt. No. 34-9 at 9; Dkt. No. 39-2 at 6.  Dewing asserts that she issued an Incident Report because Mack became "upset" and "angry" when he was asked to move to a cell in Medical II for a further evaluation of his medical needs.  Dkt. No. 34-2 at ¶ 3.  This description of Mack's behavior is supported by Jayasena and the medical record.  See Dkt. No. 35-6 at 53; Dkt. No. 35-10 at ¶ 7.  Dewing claims that she only summoned the rovers when Mack refused her repeated requests to

32

cooperate with orders.  See Dkt. No. 34-2 at ¶ 4.

While Mack disputes Defendant's characterization of his behavior as argumentative,

see Dkt. No. 34-7 at 113, he admits that he refused to take the prescribed medication

because "they didn't really know how to take care of diabetes."  Id. at 117.  Mack also

concedes that "five or six" rovers were called to "force" him into the medical cell.  Id. at 39-

40.  This testimony supports Dewing's claim that she was compelled to summon the rovers

because Mack refused to go to voluntary confinement in the medical cell.  Accordingly,

Mack has not established, with competent, admissible evidence, that the Incident Report

would not have been written "absent his protected speech."  See Chavis v. Goord, 333 F.

App'x 641, 644 (2d Cir. 2009) (summary order) (affirming dismissal of retaliation claim

where the appellant did not dispute that he had disobeyed orders, which was, in part, the

basis for the misbehavior reports) (citation omitted); see also Vega v. Artus, 610 F. Supp.

2d 185, 207 (N.D.N.Y. 2009) (concluding that the defendant would have issued the

misbehavior report even in the absence of the protected conduct and dismissing the

plaintiff's retaliation claim based on the issuance of a misbehavior report alleging that the

plaintiff had lost state-issued gloves where the plaintiff admitted that he lost the gloves).

The record before the Court, even when construed most favorably towards Mack, lacks

evidence undermining Dewing's legitimate, non-retaliatory reason for issuing an Incident

Report and Notice of Infraction.  Accordingly, the Court recommends granting this portion of

Defendant's motion for summary judgment.  See Chavis, 333 F. App'x at 644; Vega v.

Artus, 610 F. Supp. 2d at 207.

## D.  Qualified Immunity

Dewing argues that even if Mack's retaliation claim against her is substantiated, she is nevertheless entitled to qualified immunity.  See Dkt. No. 34-9 at 12-13.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available to bar a plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken, 236 F. Supp. 2d at 230. Here, Mack has not established a constitutional violation to satisfy the first prong of the qualified immunity test.  See Part II(c), supra.  Because there is no constitutional violation, the undersigned does not reach whether Mack's constitutional rights were clearly established at the time of the alleged violation.  See Aiken, 236 F. Supp. 2d at 230.  Accordingly, it is recommended that Defendant's motion on this ground be granted.

## E.  Deliberate Medical Indifference Claims

Construing the Amended Complaint liberally, Mack contends that Jayasena was deliberately indifferent to his serious medical needs on March 12, 2018.  See generally Am.

Compl.  Because the record does not clearly indicate whether Mack was incarcerated at Broome C.F. as a pretrial detainee or a convicted prisoner, his claims will be analyzed under the Eighth and Fourteenth Amendment.  See Dkt. No. 12 at 5, n. 5.

"The Eighth Amendment forbids the infliction of 'cruel and unusual punishments' on those convicted of crimes, which includes punishments that 'involve the unnecessary and wanton infliction of pain.'"  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)); see U.S. CONST. AMEND. VIII.  "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  An Eighth Amendment claim for medical indifference, has two necessary components, one objective and the other subjective.  See Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).  The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious."  Hathaway, 37 F.3d at 66 (internal quotation marks and citation omitted).  The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind."  Id.

For an inmate to state a cognizable claim of deliberate indifference, he "must make a threshold showing of serious illness or injury."  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003).  Deprivation of medical treatment is "sufficiently serious" if the injury or illness is one where there is "a condition of urgency, one that may produce death, degeneration, or extreme pain."  Hathaway, 37 F.3d at 66 (internal citation omitted).  "Determining whether a deprivation is an objectively serious deprivation entails two inquiries."  Salahuddin v.

Goord, 467 F.3d 263, 279 (2d Cir. 2006).  First, the Court must determine "whether the prisoner was actually deprived of adequate medical care."  Id.  "Prison officials are not obligated to provide inmates with whatever care the inmates desire.  Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is reasonable."  Jones v. Westchester Cnty. Dep't of Corrs., 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (internal quotation marks and citation omitted).  However, a prison official may be held liable "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Farmer v. Brennan, 511 U.S. 825, 847 (1994).  Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious.  This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  Salahuddin, 467 F.3d at 280.

> [I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

36

Id. (quotation marks and citations omitted).

Where a delay in medical treatment is alleged, "it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious.'" Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (quoting Chance, 143 F.3d at 702); see Salahuddin, 467 F.3d at 280. A delay in medical treatment must be interpreted in the "context of the seriousness of the medical need,[14] deciding whether the delay worsened the medical condition, and considering the reason for delay." Smith, 316 F.3d at 186 (internal quotation marks and citation omitted).

As to the subjective component, a prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin, 467 F.3d at 280 (citations omitted). A defendant "may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was 'insubstantial or non-existent.'" Wright v. Genovese, 694 F. Supp. 2d 137, 154 (N.D.N.Y. 2010) (quoting

---

[14]    "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.' " Salahuddin, 467 F.3d at 280 (quoting Chance, 143 F.3d at 702).

Farmer, 511 U.S. at 844).  Therefore, "the defendant's belief that his conduct posed no risk of serious harm 'need not be sound so long as it is sincere,' and 'even if objectively unreasonable, a defendant's mental state may be nonculpable.'"  Id. at 154-55 (quoting Salahuddin, 467 F.3d at 281).

Assuming Mack was a pretrial detainee at the time of the alleged incident, his deliberate indifference claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment.  See Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). The Second Circuit in Darnell reasoned that,

> [u]nlike a violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.

Id.  Such a claim is typically analyzed under a two-pronged standard.  First, the pretrial detainee must satisfy the "objective prong showing that the challenged conditions were sufficiently serious to constitute objective deprivations of" constitutional rights.  Id.  The objective prong of the deliberate indifference claim is the same as a convicted prisoner under the Eighth Amendment.  See id. at 30.  As to the subjective prong, a pretrial detainee must demonstrate that "an official does not act in a deliberately indifferent manner toward an arrestee unless the official 'acted *intentionally* to impose the alleged condition, *or recklessly* failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official *knew, or should have known*, that

38

the condition posed an excessive risk to health or safety.'" Bruno v. City of Schenectady,

727 F. App'x 717, 720 (2d Cir. 2018) (summary order) (quoting Darnell, 849 F.3d at 35).

Mack claims that Jayasena was deliberately indifferent to his serious medical needs on

March 12, 2018. See Dkt. No. 38 at 3. Mack alleges that he told Jayasena he felt like he

was "going to have a heart attack" and complained that he was "urinating a lot." Amen.

Compl. at 1, 3. In response, Jayasena refused to provide "emergency" treatment and

directed Mack to file a sick call slip. Id. at 1; Dkt. No. 38 at 3. Jayasena argues that Mack

did not suffer from a serious medical need and further, that he failed to proffer evidence

that Jayasena was deliberately indifferent to his medical needs. See Dkt. No. 35-12 at 22-

23; Dkt. No. 40-1 at 10-11.

### 1.  First Prong: Objective Component

#### a.  Adequacy of Care

To satisfy the objective component of this Eighth Amendment claim, Mack must prove

that he was deprived of adequate medical care on March 12, 2018. "[T]o state a [claim for

deliberate indifference to a serious medical condition], [a] p]laintiff must plausibly allege

that '[]objectively, the deprivation the inmate suffered was sufficiently serious that he was

denied the minimal civilized measure of life's necessities.'" Martinez v. Aycock-West, 164

F. Supp. 3d 502, 510 (S.D.N.Y. 2016) (citing Walker v. Schult, 717 F.3d 119, 125 (2d Cir.

2013)). Mack alleges in his Amended Complaint that, on March 12, 2018, at 3:00 p.m., he

told Jayasena "face to face" that he was "dehydrated and urinating a lot and [had] pain in

[his] heart[.]" Am. Compl. at 3; see Dkt. No. 34-7 at 100. Mack testified that he told

Jayasena that he was "having complications with my diabetes" including blurry vision.  Dkt. No. 34-7 at 85.  Mack also testified that he asked to go to the hospital and Jayasena responded, "we don't do that . . . you ain't going to the hospital" and "put in a sick call sheet[.]"  Id. at 86; see Am. Compl. at 3.  While Jayasena contends that the conversation did not occur, it is undisputed that, at 4:00 p.m., Mack submitted a sick call slip complaining, "peed 15 time to day and getting littie [sic] pain in my heart."  Dkt. No. 35-6 at 32.  The record also establishes that, at 4:30 p.m. on March 12, 2018, Mack "declined" a sick call visit.  Id. at 71.  Mack explained that he refused the visit because it was in response to a previously submitted sick call slip for a laxative:

> Q.  So it's your interpretation that you declined to go to sick call that you signed an hour and a half after you met Jessica with the complaint of the heart pain and the frequent urination and blurry vision, that sick call slip is you refusing to go to medical for something that you didn't go to earlier that day?
>
> A.  Yeah.

Dkt. No. 34-7 at 101-103.

The next day, Mack received a note from "medical" in response to his March 12, 2018 sick call request.  Dkt. No. 34-7 at 94.  The note communicated, "[w]e cannot understand what you are requesting.  What is your symptom?"  Dkt. No. 35-6 at 33; see Dkt. No. 34-7 at 94, 98.  Accordingly, on March 14, 2018, Mack submitted another sick call slip complaining, "[m]y sugar is hi [sic]."  Dkt. No. 35-6 at 31.  The medical records indicate that Mack was evaluated in the medical unit on March 15, 2018.  Dkt. No. 35-6 at 18-22.  At that time, Mack's blood sugar was monitored and a course of insulin was prescribed.  See id. at 21.  Mack's blood sugar was thereafter monitored before breakfast, lunch, and dinner.  See

id.; see Dkt. No. 34-7 at 103.

Jayasena contradicts Mack's account of events and denies engaging in any conversation with Mack on March 12, 2018.  See Dkt. No. 35-10 at ¶ 4.  Rather, Jayasena avers that, at that time, her "sole role . . . was to pick up sick call slips from each correctional pod and give the requests to the evening Nurse for triage."  Id.  With respect to Mack and the March 12, 2018 incident, Jayasena claims that she picked up a sick call slip, written by Mack, from the dropbox at 4:00 p.m.  See id.; Dkt. No. 35-6 at 32.

Even assuming Mack's version of events to be true, Mack has not provided evidence from which a fact-finder could reasonably conclude that Jayasena's conduct constituted an actual deprivation of adequate medical care.  See Salahuddin, 467 F.3d at 279.  Mack offers no evidence to support a conclusion that he was experiencing a condition requiring immediate emergency attention or that he was experiencing severe symptoms that were visible to Jayasena.  Indeed, during Mack's initial medical evaluation in January 2018, Mack denied any history of heart disease.  See Dkt. No. 34-7 at 76; Dkt. No. 35-6 at 6.  As a prison official's duty is only to provide reasonable care, Mack fails to demonstrate how Jayasena's response was other than reasonable care or a deprivation of adequate medical care.  See Farmer, 511 U.S. at 847; Salahuddin, 467 F.3d at 279.  As Mack provides no proof that his "condition pos[ed] a substantial risk of serious harm" or proof that he was experiencing distress and that it was visible to Jayasena, there is nothing to indicate that defendant failed to provide reasonable care.  Farmer, 511 U.S. at 834; see Darnell, 849 F.3d at 35.  Thus, it is clear from the record that Jayasena did not deprive plaintiff of adequate medical care.

41

The Court notes that Mack's medical intake form indicates a history of diabetes.  See

Dkt. No. 35-6 at 3.  To the extent that Mack suggests that Jayasena knew, or should have

known, he had diabetes, Mack provides no proof that his alleged distress on March 12,

2018, stemmed from diabetes or that he requested treatment for diabetes from Jayasena.

Indeed, there is no evidence that Mack complained about his diabetes or any symptoms

related to his diabetes to medical staff prior to March 12, 2018.  See Dkt. No. 35-6 at 32-43.

Mack testified that, upon arrival at Broome C.F. on January 12, 2018, he advised the

medical staff that he was managing his diabetes and that he hadn't taken insulin in one to

two years.  See Dkt. No. 34-7 at 76-77.  Mack's blood sugar was tested the same day and

he was told that the result was "normal."  Id. at 78-79.  The sick call slips submitted from

January 20, 2018, until March 12, 2018 contain complaints related to dental issues, dry

skin, a head cold, and requests for laxatives, but do not reference or mention of high blood

sugar.  See Dkt. No. 35-6 at 32-43.


### b.  Sufficiently Serious

Even if Mack had established a denial of adequate medical care, he has failed to show

that the denial was "sufficiently serious" because he has not demonstrate "how the

offending conduct [wa]s inadequate and what harm, if any, the inadequacy has caused or

will likely cause [him]."  Salahuddin, 467 F.3d at 280.  Mack offers no proof that he

suffered serious harm from Jayasena's failure to assist him in obtaining immediate medical

care.  See Allen v. Ford, 880 F. Supp. 2d 407, 411 (W.D.N.Y. 2012) ("An inmate's mere

disagreement over the proper treatment for his injuries does not create a constitutional

claim."). Between March 15, 2018, and March 17, 2018, Mack was evaluated by a nurse practitioner, Dr. Mahmood Butt, the Medical Director at Broome C.F., received insulin, and began a routine of having his blood checked before each meal. See Dkt. No. 34-7 at 106; Dkt. No. 35-8 at ¶¶ 3, 16, 17, 18. Mack has produced no evidence to demonstrate that he suffered a sufficiently serious harm from not obtaining immediate medical attention on March 12, 2018. See Smith, 316 F.3d at 187 (explaining that a serious medical need "exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." (internal quotation marks and citations omitted)). Thus, Jayasena's conduct in relation to Mack's medical condition does not constitute a "sufficiently serious" inadequacy in medical care. Salahuddin, 467 F.3d at 280.

Additionally, there is no evidence to support Mack's allegations of the severity of his symptoms. Even though Mack claims that he was in distress, the medical staff notes demonstrate that at 4:30 P.M., an hour and a half after he allegedly conveyed an "emergency" medical issue to Jayasena, Mack declined sick call. Dkt. No. 36-5 at 71. Further, there is no notation of heart pain or frequent urination during the sick call visit on March 14, 2018. Id. at 31. There is also no evidence that Mack was experiencing these particular symptoms at the time he requested medical attention from Jayasena. Mack's mere complaint to Defendant does not demonstrate these conditions were actually present because Mack did not testify to exhibiting any symptoms that would lead Jayasena to conclude that he was suffering from a medical emergency or in serious distress. See Dkt. No. 34-7 at 84-85. Indeed, Mack has presented no evidence beyond his own self-serving

43

statements to indicate that, at the time he spoke with Defendant, Mack was experiencing

emergency symptoms.  See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005)

("To defeat summary judgment, . . . nonmoving parties . . . may not rely on conclusory

allegations or unsubstantiated speculation.  At the summary judgment stage, a nonmoving

party must offer some hard evidence showing that its version of the events is not wholly

fanciful.") (internal quotation marks and citations omitted); see also Cole v. Artuz, No.

93-CV-5981 (WHP/JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) ("Where a

litigant is *pro se*, his pleadings should be read liberally and interpreted to raise the

strongest arguments that they suggest . . . .  Nevertheless, . . . pro se party's bald

assertion, unsupported by evidence, is not sufficient to overcome a motion for summary

judgment." (internal quotation marks and citations omitted)).  The record indicates that at

sick call two days later, Mack complained only of high blood sugar, and the medical staff

noted "[f]asting chemstrip scheduled for 3/15/18 @ 0600."  Dkt. No. 35-6 at 31.  Without

medical evidence to support Mack's claims of more serious symptoms, his self-serving

assertions of distress, the presence of heart pain and frequent urination are insufficient to

prove a "sufficiently serious" medical need.  Salahuddin, 467 F.3d at 280; see Cole, 1999

WL 983876, at *3.  Thus, Mack has failed to prove that Defendant's failure to take steps

beyond telling him to submit a sick call slip constituted a sufficiently serious deprivation of

medical care under the objective prong.

Reading the Amended Complaint liberally, insofar as Mack may be arguing that the

delay between when he spoke to Jayasena and when he was seen by medical personnel

amounts to a sufficiently serious inadequacy, he fails to provide any evidence

demonstrating that the delay was "sufficiently serious."  Salahuddin, 467 F.3d at 280.  The medical entries from March 14, 2018 through March 17, 2018 reflect that Mack was treated and that he was in no apparent distress.  See Dkt. No. 36-5 at 13-15, 31, 46, 47, 52, 53, 55. Mack offers no proof that Jayasena knew of and disregarded the severity of his diabetes when Jayasena acknowledged his request for medical attention and told him to submit a sick call slip or that his symptoms became more severe between his request for immediate medical attention and his examination on March 15, 2018.

### 2.  Second Prong: Subjective Component

Even if Mack demonstrated sufficiently serious deprivation, he fails to demonstrate how Jayasena acted with culpable intent or recklessly failed to act with reasonable care when she declined Mack's request for emergency medical attention in violation of either the Eighth or Fourteenth Amendment.

As discussed above, despite Mack's complaints, there is no evidence that Mack was suffering from visible distress.  Mack alleges in his Amended Complaint that, when he asked Jayasena for emergency care, she refused and directed him to submit a sick call slip.  See Am. Compl. at 3.  Yet in his deposition, Mack admits that he was offered, and declined sick call an hour and a half after he requested "emergency" medical attention. Dkt. No. 34-7 at 84.  While Mack claims that the subject sick call visit pertained to complaints "about going to the bathroom" and that he "went to the bathroom already . . . and [didn't] have to get there for no [sic] laxative," id. at 102, this belies his deliberate indifference claim.  There is nothing to indicate that Jayasena knew, or should have known,

45

that Mack's condition posed an excessive risk to his health.  See Darnell, 849 F.3d at 35. Thus, there is nothing to indicate that Jayasena acted intentionally or recklessly failed to act with reasonable care in response to Mack's request for medical treatment.  See Darnell, 849 F.3d at 35; Salahuddin, 467 F.3d at 280. Therefore, Mack has failed to raise a material question of fact whether Jayasena knew of and disregarded an excessive risk to Mack's health or safety.  Accordingly, Mack has not demonstrated that Jayasena was deliberately indifferent to a serious medical condition, and it is recommended that Defendant's motion on this ground be granted.

## IV.  CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED** that Dewing's motion for summary judgment (Dkt. No. 34) be **GRANTED** on the grounds that Plaintiff failed to exhaust his administrative remedies. Alternatively, if reached, Dewing's motion for summary judgment should be **GRANTED** as to Plaintiff's First Amendment retaliation claims.  Alternatively, if reached, Dewing's motion for summary judgment on the issue of qualified immunity should be **GRANTED**; and it is further

**RECOMMENDED** that Hall's and Jayasena's motion for summary judgment (Dkt. No. 35) be **GRANTED**; and it is further

**ORDERED** that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1( c), the parties have fourteen

days within which to file written objections to the foregoing report. Such objections shall be

filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d

85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15

(2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Date: July 27, 2020
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge